1
2
3
4
5
6
7

8 **IN THE UNITED STATES DISTRICT COURT**

9 **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11 CAROLYN MARTIN,                          CASE NO. CV F 05-0862 LJO

12           Plaintiff,                      **DECISION ON SOCIAL SECURITY**
                                            **COMPLAINT**
13           vs.                            (Docs. 14-16.)

14 JO ANNE B. BARNHART,
   Commissioner of Social
15 Security,

16           Defendant.
                                    /
17

18                          **INTRODUCTION**

19       Plaintiff Carolyn Martin ("plaintiff") seeks this Court's review of an administrative law judge's

20 ("ALJ's") decision that plaintiff is neither disabled nor entitled to disability insurance benefits and

21 Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act ("Act"), 42

22 U.S.C. §§ 401-433 and 1381-1382c.  Pursuant to 28 U.S.C. § 636(c) and F.R.Civ.P. 73, the parties

23 agreed to proceed before a United States Magistrate Judge, and by an November 17, 2005 order, this

24 action was assigned to United States Magistrate Judge Lawrence J. O'Neill for all proceedings.  Based

25 on review of the Administrative Record ("AR") and the papers of plaintiff and defendant Jo Anne B.

26 Barnhart, Commissioner of Social Security ("Commissioner"), this Court DENIES plaintiff's request

27 to reverse the Commissioner's decision to deny plaintiff disability insurance benefits and SSI or to

28 remand for further proceedings.

# BACKGROUND

## Personal Background

Plaintiff is age 41, completed high school, and has past relevant work as a cashier, cook, house manager and rehabilitation assistant.  (AR 20, 27, 80, 92, 97, 100, 110, 115, 118, 451, 452.)

## Administrative Proceedings

On February 27, 2003, plaintiff filed her disability insurance benefits and SSI applications to claim disability since December 31, 2002 due to congestive heart failure, inability to breathe, swelling of hands and feet, right shoulder injury, high blood pressure, and obesity. (AR 80, 91, 109, 440.)[1]  With its June 24, 2003 Notice of Disapproved Claims, the Social Security Administration ("SSA") denied plaintiff's claims and determined that her condition was not severe enough to prevent her to work.  (AR 62.)  On August 25, 2003, plaintiff filed her Request for Reconsideration to claim she is unable to work because of continued pain and treatment for valley fever.  (AR 66.)  With its September 18, 2003 Notice of Reconsideration, SSA again denied plaintiff's claims and determined that plaintiff's condition is not severe enough to prevent her to work.  (AR 67.)

On October 22, 2003, counsel was appointed for plaintiff.  (AR 34.)  On October 24, 2003, plaintiff filed her Request for Hearing by Administrative Law Judge to claim she is unable to work.  (AR 71.)  After a September 28, 2004 hearing, the ALJ issued his November 30, 2004 decision to conclude that plaintiff has a residual functional capacity for sedentary work, is not disabled and thus is not entitled to disability insurance benefits or SSI.  (AR 26, 28.)

Plaintiff submitted to SSA's Appeal Council her December 15, 2004 Request for Review of Hearing Decision/Order to claim she is unable to work.  (AR 14.)  On April 15, 2005, the Appeals Council denied plaintiff's request to render the ALJ's November 30, 2004 decision subject to this Court's review.  (AR 10.)

## Medical History And Records Review

### Workers Compensation Injury

On May 29, 1998, plaintiff worked as a rehabilitation assistant and was injured when a client fell

---

[1]   Plaintiff had filed June 17, 2002 disability insurance benefits application (AR 76) and a July 16, 2002 SSI application (AR 435), however, plaintiff's February 27, 2003 applications are operative here.

back onto plaintiff with the client's full weight to plaintiff's right shoulder.  (AR 172, 263, 347.)
Plaintiff received treatment through the workers compensations system.

### *Armando Alvarez, M.D., Treating Physician*

On May 29, 1998, the date of her on-the-job injury, plaintiff was seen by Armando Alvarez, M.D. ("Dr. Alvarez"), at Mercy Healthcare Bakersfield.  (AR 347.)  Dr. Alvarez' examination revealed plaintiff's tender neck and slightly tender right shoulder with full range of motion.  (AR 347.)  Dr. Alvarez assessed cervical and right arm, shoulder and trapezius muscle strain.  (AR 348.)  Dr. Alvarez gave plaintiff Motrin 600 mg, prescribed Norflex, gave plaintiff a soft collar for comfort, and recommended warm shower massage.  (AR 348.)  Dr. Alvarez found plaintiff able to return to work with lifting limited to 10 pounds and desk work, if available.  (AR 348.)  Dr. Alvarez noted that x-rays "showed no acute process."  (AR 348.)

On July 3, 1998, plaintiff complained of abduction problems at the shoulder and shoulder pain worsening trapezius and neck pain.  (AR 322.)  Plaintiff further claimed she reinjured herself on the job on June 20, 1998 to result in increased pain to her right shoulder and right side of her neck.  (AR 322.)  Dr. Alvarez' examination revealed slight tenderness to plaintiff's neck and right trapezius and significant tenderness to plaintiff's right shoulder.  (AR 322.)  Dr. Alvarez assessed right shoulder pain, right trapezius strain, cervical strain, and right shoulder strain with concern of possible right rotator cuff injury.  (AR 323.)  Dr. Alvarez noted "significant improvement concerning her injury" and possible "plateau in her management."  (AR 323.)  Dr. Alvarez placed plaintiff on Norflex and Motrin for pain management and returned plaintiff to work on duty limited to lifting 15 pounds and desk work, if available.  (AR 323.)

On November 5, 1998, plaintiff complained of increased pain and decreased range of motion to her right shoulder.  (AR 310.)  Dr. Alvarez' examination revealed plaintiff's right shoulder tenderness and significant pain and inability to raise her arm over her head secondary to pain.  (AR 310.)  Dr. Alvarez assessed concern about possible right rotator cuff injury, right shoulder and trapezius strain, and cervical strain.  (AR 311.)  Dr. Alvarez continued plaintiff on nonsteroidal anti-inflammatories and restricted plaintiff to lifting 20 pounds but nothing overhead and to office work, if available.  (AR 311.)

### *Mercy Healthcare Bakersfield*

Following plaintiff's right shoulder injury, plaintiff was referred to physical therapy at Mercy Healthcare Bakersfield.  (AR 325, 331, 332, 334, 336, 339, 341.)  June 1998 physical therapist notes reflect goals to address plaintiff's complaints of right arm pain and decreased hand strength, range of motion and function.  (AR 326, 329, 330.)  June 24, 1998 notes reflect plaintiff was doing well and was assessed with cervical and right shoulder strain.  (AR 328.)  Plaintiff cancelled or failed to show for numerous  physical therapy appointments in September and October 1998.  (AR 314, 319, 320.)

After her February 4, 1999 right shoulder decompression surgery, plaintiff resumed physical therapy with goals to increase range of motion and to decrease pain.  (AR 299.)  In March 1999, plaintiff continued her pattern of canceling or failing to show for physical therapy appointments.  (AR 296.)

On December 31, 2002, plaintiff presented to the emergency room with chest pain complaints.  (AR 294.)  A gall bladder ultra sound and chest x-rays were unremarkable.  (AR 278, 281, 282.)  Plaintiff was assessed with atypical chest pain and found stable for discharge.  (AR 278, 280.)

### *Christopher D. Hamilton, M.D., Treating Orthopedist*

On August 10, 1998, plaintiff saw orthopedist Christopher D. Hamilton, M.D. ("Dr. Hamilton"), for an initial orthopedic consultation.  (AR 172.)  Plaintiff complained of constant right shoulder dull ache which radiated down her arm and into her fingers, hand numbness and forearm tingling.  (AR 173.)  Dr. Hamilton's examination revealed plaintiff's marked pain with right shoulder motion extremes, clicking and popping with range of motion, weakness of the supraspinatus and external rotators, and marked biceps pain.  (AR 174.)  Dr. Hamilton assessed right rotator cuff strain and possible right slap lesion.  (Ar 175.)  Dr. Hamilton restricted plaintiff to lifting 15 pounds.  (AR 175.)  As of August 28, 1998, plaintiff continued to have discomfort with abduction/external rotation.  (AR 170.)  Dr. Hamilton's examination revealed mildly positive impingement signs.  (AR 170.)  Magnetic resonance imaging ("MRI") reveal plaintiff's intact rotator cuff.  (AR 170.)  Dr. Hamilton assessed right shoulder strain with persistent pain and recommended conservative treatment. (AR 170.) Dr. Hamilton continued plaintiff on "regular work as tolerated." (AR 171.)  On September 29, 1998, plaintiff reported that she felt better and stronger.  (AR 168.)  Dr. Hamilton noted some mild impingement and improved rotator cuff strength and range of motion.  (AR 168.)  Dr. Hamilton assessed right shoulder pain, continued

plaintiff on her therapy program and Naprosyn, and restricted plaintiff to lifting 20 pounds and no repetitive work above the right shoulder. (AR 168.) On October 23, 1998, plaintiff presented with right shoulder pain and received a cortisone injection. (AR 165, 166.) Dr. Hamilton continued to preclude plaintiff from lifting more than 20 pounds and repetitive work above the shoulder. (AR 166.)

Plaintiff was referred to Dr. Hamilton for a November 6, 1998 urgent evaluation, and Dr. Hamilton noted marked tenderness diffusely around the shoulder, impingement signs markedly positive, and external rotators and supraspinatus weakness. (AR 163.) Dr. Hamilton assessed recurrent right shoulder impingement and placed plaintiff on temporary total disability. (AR 164.) On November 24, 1998, plaintiff reported improvement and increased strength. (AR 161.) Dr. Hamilton assessed persistent right shoulder pain and continued plaintiff on therapy with addition of high speed and endurance exercises. (AR 162.) Dr. Hamilton kept plaintiff on temporary total disability. (AR 162.) On December 22, 1998, plaintiff complained of persistent pain with overhead activities and significant discomfort with therapy. (AR 157.) Dr. Hamilton assessed persistent right shoulder pain and impingement and recommended surgery with exhaustion of conservative treatment. (AR 157, 158.) Dr. Hamilton returned plaintiff to work with preclusion to lift more than 20 pounds and of repetitive work at or above the shoulder. (AR 158.)

On February 4, 1999, Dr. Hamilton performed arthroscopic surgery for decompression of plaintiff's right shoulder to address her impingement syndrome. (AR 263, 301.)

On December 5, 2000, plaintiff complained of burning, stabbing pain to the right shoulder, aggravated pain from pressure, popping and clicking in the shoulder and limited range of motion. (AR 155.) Dr. Hamilton's examination revealed mild shoulder tenderness, good rotator cuff strength and absence of shoulder instability. (AR 152.) Dr. Hamilton assessed chronic right shoulder pain and noted that surgery is reasonable. (AR 154.) As of January 22, 2001, Dr. Hamilton noted that MRIs revealed that the rotator cuff does not appear to be torn and there is a question of acromioclavicular joint arthritis. (AR 149.)

### John Larsen, M.D., Treating Orthopedic Surgeon

On March 25, 1999, plaintiff started to treat with orthopedic surgeon John Larsen, M.D. ("Dr. Larsen"), and complained of constant pain to her right shoulder, hand and wrist up to her elbow and

intermittent neck pain, radiating between her neck and right shoulder and to her head to cause headaches three times a week.  (AR 270.)  Dr. Larsen diagnosed cervical strain, recommended further physical therapy, found plaintiff unable to return to her rehabilitation assistant duties, and placed plaintiff on temporary total disability.  (AR 271.)  On April 26, 1999, plaintiff complained of right shoulder pain and noted that physical therapy helped.  (AR 265.)  Dr. Larsen's report noted mild anterior tenderness with palpation over plaintiff's right shoulder.  (AR 265.)  Dr. Larsen diagnosed cervical strain and continued plaintiff on physical therapy three times a week for four weeks and prescribed Arthrotec.  (AR 266.)  On May 26, 1999, plaintiff reported that her function improved "quite a bit" and that she performed household chores and held her baby "with confidence."  (AR 261.)  Dr. Larsen's examination revealed right shoulder full range of motion and negative impingement sign.  (AR 261.)  Dr. Larsen diagnosed cervical spine strain.  (AR 263.)  On June 30, 1999, plaintiff noted her shoulder continued to bother her. (AR 257.)  Dr. Larsen noted shoulder tenderness and weakness and that plaintiff was not improving. (AR 260.)  Dr. Larsen continued plaintiff on physical therapy and his cervical spine strain diagnosis. (AR 260.)

On August 5, 1999, plaintiff complained of right shoulder pain.  (AR 254.)  Dr. Larsen's examination revealed nearly full range of motion with neither shoulder tenderness nor arm numbness and tingling.  (AR 254.)  Dr. Larsen injected plaintiff's trapezoidal trigger point with Celestone and Lidocaine, noted plaintiff's slow improvement, continued physical therapy and cervical spine strain diagnosis, maintained plaintiff on temporary total disability, and admonished plaintiff "to be regular with her physical therapy" because she had missed sessions.  (AR 255.)  On September 1, 1999, plaintiff complained of persistent shoulder problems.  (AR 251.)  Dr. Larsen's examination revealed relative good range of motion, tenderness and substantial pain.  (AR 252.)  Dr. Larsen recommended an MRI scan since plaintiff was not doing as well as hoped and maintained plaintiff on temporary total disability. (AR 252.)  Dr. Larsen diagnosed persistent right shoulder symptomatology and cervical strain.  (AR 252.)  On October 6, 1999, plaintiff continued as "rather poorly," and Dr. Larsen noted shoulder tenderness and diagnosed persistent right shoulder symptomatology and cervical strain.  (AR 249.)  Dr. Larsen injected plaintiff's shoulder with Lidocaine and Celestone and continued plaintiff on home exercises and temporary total disability.  (AR 249.)  On November 16, 1999, plaintiff continued to

experience neck pain, and Dr. Larsen diagnosed persistent right shoulder pain and cervical strain. (AR 241.) Dr. Larsen prepared a November 29, 1999 permanent and stationary report to note plaintiff's symptoms of constant pain to her right shoulder, hand and wrist up to her elbow and intermittent neck pain radiating between her neck and right shoulder and into her head to cause headaches three times a week. (AR 244.) Dr. Larsen opined that plaintiff reached "maximal medical improvement" and was permanent and stationary. (AR 245.) Dr. Larsen restricted plaintiff from repetitive neck motion, prolonged above shoulder level work, forceful gripping, grasping and torquing, right upper extremity heavy lifting, pushing or pulling, and return to heavy work. (AR 246.) Dr. Larsen recommended retraining as soon as possible. (AR 247.)

On May 2, 2000, after plaintiff complained of increased right shoulder pain, Dr. Larsen injected plaintiff's right subacromial space with Depo-Medrol, Lidocaine and Marcaine. (AR 239.) Dr. Larsen prescribed Lodine and diagnosed persistent right shoulder pain and cervical strain. (AR 239.) On June 14, 2000, plaintiff noted the injection provided three days relief. (AR 235.) Dr. Larsen diagnosed persistent right shoulder pain and cervical strain and injected Lidocaine, Marcaine and Depo-Medrol into the acromioclavicular joint of plaintiff's right shoulder. (AR 236.) On October 5, 2000, plaintiff's right shoulder bothered her substantially. (AR 232.) Dr. Larsen diagnosed persistent right shoulder impingement with acromioclavicular joint pain and cervical strain and recommended an arthroscopic subacromial decompression and excisional acromioclavicular joint arthroplasty. (AR 232, 233.) Dr. Larsen placed plaintiff on temporary total disability. (AR 233.)

Dr. Larsen conducted a December 1, 2000 Qualified Medical Evaluation to address plaintiff's July 18, 1997 right knee injury. (AR 221.) Plaintiff complained of continual right knee pain which worsens with walking, bending and climbing stairs and intermittent left knee pain. (AR 225.) Dr. Larsen's examination revealed right knee tenderness about the joint line and full range of motion. (AR 223.) Dr. Larsen restricted "very prolonged weight bearing or repetitive kneeling." (AR 223.)

On December 11, 2000, plaintiff returned for right shoulder evaluation. (AR 218.) Dr. Larsen noted pain on palpation and decreased range of motion due to pain and diagnosed persistent right shoulder impingement and cervical strain. (AR 219.) On January 25, 2001 and March 6, 2001, Dr. Larsen noted plaintiff's right shoulder range of motion limited by pain. (AR 212, 215.) Dr. Larsen

diagnosed persistent right shoulder impingement with acromioclavicular joint pain and cervical strain and recommended right shoulder surgery.  (AR 213, 216.)  On March 28, 2001, Dr. Larsen performed for plaintiff an arthroscopic right shoulder release with subacromial decompression and Mumford procedure.  (AR 177, 180, 182, 183.)  Plaintiff was discharged the next day with her pain "under good control" and no complications.  (AR 180.)

On April 5, 2001, Dr. Larsen found plaintiff "is doing much better" after surgery and that her right shoulder range of motion is limited due to pain.  (AR 209.)  X-rays revealed neither fracture, subluxation nor acute inflammation.  (AR 210.)  Dr. Larsen continued his diagnosis of persistent right shoulder impingement with acromioclavicular joint pain and cervical strain.  (AR 210.)  Dr. Larsen placed plaintiff in physical therapy three times a week.  (AR 210.)  On May 7, 2001, Dr. Larsen noted plaintiff's improved shoulder pain and success with initial physical therapy although plaintiff canceled six appointments.  (AR 207.)  X-rays revealed neither fracture, subluxation nor infection.  (AR 207.)  Dr. Larsen continued his diagnosis of persistent right shoulder impingement with acromioclavicular joint pain and cervical strain and physical therapy three times a week for five weeks.  (AR 207.)

As of June 12, 2001, Dr. Larsen noted plaintiff's continued improvement and absence of right shoulder swelling.  (AR 203.)  Dr. Larsen diagnosed status post right shoulder revision subacromial decompression and cervical strain and maintained plaintiff on physical therapy three times a week for five weeks.  (AR 204.)  On August 15, 2001, plaintiff continued to experience pain despite a negative right shoulder impingement maneuver.  (AR 199.)  X-rays revealed neither fractures, subluxation nor severe degenerative changes.  (AR 200.)  Dr. Larsen diagnosed status post right shoulder revision subacromial decompression and cervical strain, maintained plaintiff on physical therapy three times a week for five weeks, and recommended a right shoulder MRI.  (AR 200.)  On September 26, 2001, plaintiff complained of persistent shoulder pain, and x-rays revealed neither fractures, subluxation or severe degenerative changes.  (AR 196.)  Plaintiff diagnosed cervical strain status post right shoulder revision cervical decompression and compensatory left shoulder strain.  (AR 196.)  Dr. Larsen maintained plaintiff on physical therapy and temporary total disability.  (AR 196, 197.)  On November 12, 2001, plaintiff continued to complain about her right shoulder and had lesser complaints as to her left shoulder and neck.  (AR 189.)  Dr. Larsen's examination revealed full range of motion.  (AR 190.)

Dr. Larsen diagnosed cervical strain, right shoulder pain, and left shoulder strain – compensatory. (AR 190.) Dr. Larsen opined that plaintiff "reached a point of maximum medical improvement" with no further improvement to result in permanent disability. (AR 191.) Dr. Larsen restricted plaintiff from repetitive neck motion. (AR 191.) Dr. Larsen gauged that as to plaintiff's right shoulder, she had lost 50 percent of her pre-injury capacity for physical effort and work at or above shoulder level, and that as to her left shoulder, plaintiff had lost 10 percent of her pre-injury capacity for physical effort and work at or above the shoulder level. (AR 192.)

### Kern Medical Center Urgent Care

On March 25, 2002, plaintiff arrived at Kern Medical Center Urgent Care and complained of chest pain and shortness of breath. (AR 375.) Plaintiff was diagnosed with chest pain of unknown etiology. (AR 375.) On August 19, 2003, plaintiff was assessed with valley fever. (AR 373.)

### Central Valley Medical Group

Plaintiff treated with Central Valley Medical Group, and a May 28, 2002 examination revealed plaintiff's tender right knee with no swelling, tender right hip, and right ankle edema. (AR 361, 362.) On September 23, 2002, plaintiff complained of gastrointestinal upset with diarrhea. (AR 358.) On December 27, 2002, plaintiff complained of chest pain. (AR 356.) On January 2, 2003, plaintiff complained of headaches with pressure to her temples. (AR 354.) On January 10, 2003, plaintiff complained of fatigue. (AR 353.)

### Tomas B. Rios, M.D., Consultative Internist

Board certified internist Tomas B. Rios, M.D. ("Dr. Rios"), conducted a September 6, 2002 comprehensive internal medicine examination of plaintiff. (AR 273.) Plaintiff's chief complaints were right shoulder injury, diabetes and sleep apnea. (AR 273.) Plaintiff reported to Dr. Rios that she is able to drive and tries to help with household chores. (AR 274.) Dr. Rios' examination revealed that plaintiff was not in severe distress and was able to move about without significant difficulty. (AR 274.) Dr. Rios found preserved motor strength of 5/5 in plaintiff's upper and lower extremities and that her grip strength is "bilaterally strong and adequate." (AR 275.) Dr. Rios diagnosed status post arthroscopic right shoulder surgery, diabetes mellitus and sleep apnea syndrome. (AR 275.) As to plaintiff's chronic right shoulder pain, Dr. Rios noted limited range of motion secondary to pain but "no true impingement

syndrome." (AR 276.) Dr. Rios commented: "This patient will have difficulty with any repetitive above the shoulder work, or with forceful push/pull activity using the right (dominant) arm." (AR 276.) Dr. Rios found that plaintiff's diabetes mellitus did not significantly compromise plaintiff's mobility and equilibrium. (AR 276.) Dr. Rios found no early pulmonary hypertension in connection with plaintiff's sleep apnea. (AR 276.)

### *Emanuel Dozier, M.D., Consultative Internist*

Internist Emanuel Dozier, M.D. ("Dr. Dozier"), conducted a May 30, 2003 consultative comprehensive internal medicine evaluation. (AR 366.) Plaintiff's chief complaints were congestive heart failure and chronic low back pain. (AR 366.) Plaintiff recounted that she had experienced persistent episodes of atypical chest pain, chronic dyspnea on exertion, sleep apnea with daytime drowsiness, swelling in both lower extremities and persistent low back pain. (AR 367.) Dr. Dozier observed that plaintiff ambulated slowly, was able to sit but required assistance to transfer on and off the examination table. (AR 368.) Dr. Dozier noted plaintiff's 5/5 motor strength in upper and lower extremities bilaterally and 5/5 grip strength bilaterally. (AR 370.) Dr. Dozier assessed chronic mechanical low back pain, posttraumatic arthritis in the right shoulder status post rotator cuff syndrome with surgical repair, and history of class two congestive heart failure. (AR 370.) Dr. Dozier restricted plaintiff to occasional stooping, bending and crouching and placed "manipulative restrictions on activities that involve lifting above the head using the right upper extremity." (AR 370.) Dr. Dozier assessed environmental restrictions of temperature extremes of heat or cold, wet surfaces and incline plains. (AR 370.) Dr. Dozier assessed that plaintiff is able to lift/carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk six hours, and sit six hours. (AR 370.)

### *Good Samaritan Hospital*

In June 2004, plaintiff was admitted to Good Samaritan Hospital in Bakersfield with complaints of chest pain radiating down her left upper abdomen and epigastrium and episodes of nausea or vomiting. (AR 402.) Plaintiff was stabilized and discharged with a diagnosis of costochondritis resolved, gastroenteritis resolved, hypokalemia resolved, dehydration resolved, and diabetes controlled. (AR 402.)

/ / /

10

1    _____***Non-Examining State Agency Physicians***

2    Lavanya Bobba, M.D. ("Dr. Bobba"), a California Disability Determination Services ("DDS")

3    physician, completed a September 25, 2002 Physical Residual Functional Capacity Assessment to

4    conclude that plaintiff is able to: (1) lift/carry 20 pounds occasionally and 10 pounds frequently; (2)

5    stand/walk about six hours in an eight-hour workday; (3) sit about six hours in an eight-hour workday;

6    and (4) occasionally climb, balance, stoop, kneel, crouch and crawl. (AR 393.) As to manipulative

7    limitations, Dr. Bobba found plaintiff limited in only reaching all directions (including overhead). (AR

8    394). For environmental limitations, Dr. Bobba's only limitation was to avoid concentrated exposure

9    to hazards. (AR 395.) Dr. Bobba assessed a light residual functional capacity with right upper extremity

10   limitations. (AR 397.)

11   DDS physician Anne M. Khong, M.D. ("Dr. Khong"), completed a June 12, 2003 Physical

12   Residual Functional Capacity Assessment to conclude that plaintiff is able to: (1) lift/carry 20 pounds

13   occasionally and 10 pounds frequently; (2) stand/walk about six hours in an eight-hour workday; (3) sit

14   about six hours in an eight-hour workday; and (4) occasionally climb, balance, stoop, kneel, crouch and

15   crawl. (AR 378-379.) Dr. Khong noted neither manipulative, visual, communicative nor environmental

16   limitations. (AR 380-381.) Dr. Khong assessed a medium residual functional capacity with postural

17   limits. (AR 390.) Another DDS physician agreed with Dr. Khong's assessment. (AR 384.)

18   _____***Medical Imaging***

19   A May 29, 1998 imaging services report for plaintiff's cervical spine revealed negative findings.

20   (AR 346.) A June 10, 1998 imaging services report revealed no fracture to plaintiff's right shoulder.

21   (AR 335.) February 2, 1999 chest x-rays were normal. (AR 302- 304.) A September 18, 1999 MRI of

22   plaintiff's right shoulder revealed moderate supraspinatus tendinosis or tendinitis, with mild

23   impingement of the supraspinatus musculotendinous junction by the distal end of the right clavicle. (AR

24   187.) An October 6, 2000 MRI of plaintiff's right shoulder revealed plaintiff's grossly normal rotator

25   cuff with no evidence of tendinosis, tears or retraction. (AR 185.) May 30, 2003 lumbar spine x-rays

26   were normal. (AR 372.)

27   A June 7, 2004 pelvic ultrasound, abdominal ultrasound and chest x-ray were unremarkable. (AR 429-

28   431.)

1

*Medications*

2       Plaintiff's medications have included Vicodin 750 mg, Motrin, Furosemide 40 mg, Prozac 20

3 mg, Xanax, Lasix 40 mg, Actos 30 mg, Ibuprofen 800 mg, Neurontin 300 mg, Antivert 25 mg,

4 Clonazepam .5 mg, Glucosamine 500 mg, Glyburide 500 mg, Potassium, Fludxetine 20 mg, aspirin,

5 Mecuzine 25 mg, Fleyeril 10 mg, Salsalate 500 mg, and Nitrolin .4 mg.  (AR 96, 143, 145, 147.)

6

**Plaintiff's Activities And Testimony**

7

*Reports And Questionnaires*

8       Plaintiff completed a June 10, 2002 Disability Report Adult[2] to note her 5-foot-2 height and

9 weight of 289 pounds.  (AR 90.)  Plaintiff's condition prevents her to stand or lift.  (AR 91.)  Plaintiff

10 is forgetful and more depressed and experiences crying spells and mood swings.  (AR 99.)

11       Plaintiff completed a February 26, 2003 Disability Report Adult to note her weight of 299

12 pounds.  (AR 108.)  Plaintiff condition limits her to work because of stress, difficulty to breathe and sit,

13 and sleeping easily.  (AR 109.)  Plaintiff stopped working on December 31, 2002 because of inability

14 to drive to work on the freeway.  (AR 109.)

15       According to a March 10, 2003 Work Activity Report – Employee, plaintiff performed temporary

16 work for the U.S. Department of Commerce, Bureau of Census in 2000 and rehabilitation work for a

17 neurological skills center in 2001.  (AR 126.)

18       Plaintiff completed a March 21, 2003 Exertional Daily Activities Questionnaire to note that she

19 lives with her family in a house.  (AR 133.)  Plaintiff's children assist her with dressing and meal

20 preparation. (AR 133.)  Plaintiff experiences chest pains, night sweats and sleep difficulties. (AR 133.)

21 Plaintiff is forgetful and unable to complete a four- to six-hour shift.  (AR 133.)  Plaintiff goes to the

22 grocery store five times a week.  (AR 133.)  Plaintiff drives everyday to take her son to school and

23 around town for 30 minutes.  (AR 134.)  Plaintiff tires quickly and has two or three daily rest periods

24 of 30-60 minutes. (AR 135.)  Plaintiff uses a cane as needed because of her right knee and left hip. (AR

25 135.)

26       Plaintiff completed an August 23, 2003 Reconsideration Disability Report to note she has a slight

27 _____

28      [2]     Plaintiff apparently completed the report in connection with her June 17, 2002 disability insurance benefits application.

1   heart artery block and takes more valley fever medication.  (AR 136.)  Plaintiff sleeps a lot when she

2   takes her medications in the day time and is awake at night to require sleeping pills.  (AR 138.)  Plaintiff

3   is becoming more depressed and walks less.  (AR 138.)

4        In an October 21, 2003 statement, plaintiff claimed worsening of her heart, diabetes, depression

5   and shoulder and trouble with daily living activities.  (AR 142.)

6                    ***Plaintiff's September 28, 2004 ALJ Hearing Testimony***

7        Plaintiff testified at the September 28, 2004 ALJ hearing that she is right-handed, is 5-foot-2 and

8   weighs 300 pounds.  (AR 452.)  Prior to becoming a rehabilitation assistant, plaintiff worked at

9   department stores and in fast food. (AR 453.)  Plaintiff worked as a rehabilitation assistant for five years

10  until 2001.  (AR 452.)  Plaintiff tried to work in 2002 but claimed that she did not remember the type

11  of work.  (AR 452, 455.)  When asked if she worked for the U.S. Department of Commerce, Bureau of

12  Census, plaintiff responded: "That must be it."  (AR 455.)  Plaintiff continued to note that she worked

13  for the Bureau of Census for a month or month and a half.  (AR 456.)  In 2002, plaintiff also worked for

14  a collection agency in Sacramento. (AR 458.)  Plaintiff last worked on December 31, 2002, her alleged

15  disability onset date and when she was diagnosed with congestive heart failure.  (AR 458-459.)  Plaintiff

16  claimed that she no longer works because she injured her right shoulder in her rehabilitation assistant

17  job.  (AR 453.)  Nonetheless, plaintiff applied for work a month prior to the ALJ hearing.  (AR 468.)

18       Plaintiff experiences problems lifting with her right arm and is limited to lifting 10 pounds with

19  it.  (AR 460.)  Plaintiff is able to walk a block or two.  (AR 460.)  Plaintiff is unable to kneel, stoop or

20  squat without problems.  (AR 460.)  Plaintiff is able to stand 35-45 minutes.  (AR 461.)  When sitting,

21  plaintiff becomes restless, and her neck and back start to hurt.  (AR 461.)

22       Plaintiff has diabetes which she treats with medication.  (AR 459-460.)  Plaintiff took oxygen

23  at home until she could no longer afford it.  (AR 461.)  Plaintiff takes pills for high blood pressure.  (AR

24  461, 471.)  Plaintiff had fallen down several times but has become more careful.  (AR 462.)  Plaintiff

25  contracted valley fever in the 1980s.  (AR 462.)  Plaintiff's feet swell.  (AR 462.)  Plaintiff's knees hurt.

26  (AR 462.)  Plaintiff experiences constant shoulder, arm and back pain and headaches everyday.  (AR

27  462, 463, 469.)  Plaintiff's most severe pain is in her right shoulder traversing down the left side of her

28  back.  (AR 463.)  On a 1-5 scale, plaintiff rates her pain as 2.5.  (AR 469.)  Plaintiff takes Motrin 800

1    mg for pain after which she naps for two to three hours.  (AR 470.)  Plaintiff has sleeping difficulty.

2    (AR 466.)

3         Physical therapy for plaintiff's right shoulder did not help.  (AR 463.)  Plaintiff had no physical

4    therapy within a year of the ALJ hearing.  (AR 463.)

5         Plaintiff's congestive heart failure symptoms included chest pain, breathing difficulty, and

6    swelling to her hands, ankles and legs.  (AR 459.)  Plaintiff continued to experience the symptoms as

7    of the ALJ hearing.  (AR 459.)  Plaintiff experiences small chest pain once a week for which she takes

8    Nitrogylcerine spray.  (AR 471.)  Plaintiff has gone to the emergency room three or four times to address

9    heart problems.  (AR 459.)   Plaintiff takes Lasix and aspirin for her heart condition.  (AR 471.)

10        Plaintiff's medications cause her to become tired and drowsy, and some cause her to become

11   restless.  (AR 463.)

12        Although plaintiff is depressed, she has not seen a psychiatrist or psychologist.  (AR 477.)

13        Plaintiff lives with her mother and then late teenage children.  (AR 464.)  Plaintiff spends a

14   normal day "[s]leeping, eating, watching TV."  (AR 465.)  Plaintiff shares cooking with her children

15   who perform most household chores although plaintiff helps with dish washing.  (AR 465, 474.)

16   Plaintiff changes bedding.  (AR 474.)  Plaintiff grocery shops with her children.  (AR 465.)  Plaintiff is

17   unable to carry a full kitchen trash bag but is able to carry a small trash bag.  (AR 475.)  Plaintiff has a

18   driver's license and drives but at times forgets where she is, and her back and legs become stiff.  (AR

19   452, 475.)  Plaintiff drives two miles to church.  (AR 475.)

20        Plaintiff has no general difficulty dressing and bathing.  (AR 465.)  Plaintiff has difficulty

21   grabbing with her right hand which becomes numb.  (AR 465.)  Plaintiff attends church but needs to get

22   up and down.  (AR 466.)  Plaintiff sings in her church choir.  (AR 473.)  Plaintiff tries to walk for

23   exercise.  (AR 466.)  Plaintiff does not believe that she could be on her feet six out of eight hours in an

24   eight-hour day.  (AR 467.)

25        Plaintiff was unable to obtain updated medical records because she lacks money.  (AR 454.)

26                              **The ALJ's Findings**

27   _____With his November 30, 2004 decision, the ALJ identified the specific issue as whether plaintiff

28   is under a disability, defined as inability to engage in substantial gainful activity by reason of a medically

                                    14

determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.  (AR 20.)  In concluding plaintiff is not disabled and thus entitled to neither disability insurance benefits nor SSI, the ALJ found:

1.  Plaintiff's chronic mechanical low back pain, post traumatic right shoulder arthritis with status post rotator cuff syndrome and surgical repair and obesity are severe impairments but do not meet or medically equal an impairment in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listing of Impairments").

2.  Plaintiff's allegations regarding her limitations are not totally credible.

3.  Plaintiff has the residual functional capacity to lift 10 pounds, walk/stand two hours, sit six hours, and occasionally perform postural activities and overhead right reaching.

4.  Plaintiff has neither visual, communicative, mental, environmental nor manipulative limitations.

5.  Plaintiff is unable to perform her past relevant work.

6.  Plaintiff has the residual functional capacity to perform the full range of sedentary work.

7.  Based on an exertional capacity for sedentary work and plaintiff's age, education and work experience, a not disabled finding is directed by sections 201.25 and 201.26 of the Medical-Vocational Guidelines, 20 C.F.R., Part 404, Subpart P, Appendix 2 ("Medical-Vocational Guidelines").

## DISCUSSION

### Standard Of Review

Congress has provided limited judicial review of a Commissioner's decision made through an ALJ.  *See* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . .).  A court must uphold the Commissioner's decision, made through an ALJ, when the determination is not based on legal error and is supported by substantial evidence.  *See Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985); *Sanchez v. Secretary of Health & Human Services*, 812 F.2d 509, 510 (9th Cir. 1987) (two consulting physicians found applicant

/ / /

/ / /

could perform light work contrary to treating physician's findings).[3]  Substantial evidence is "more than a mere scintilla," *Richardson v. Perales*, 402 U.S. 389, 402, 91 S.Ct. 1420 (1971), but less than a preponderance, *Sorenson v. Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975).  Substantial evidence "means such evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401, 91 S.Ct. 1420; *Sandgathe*, 108 F.3d at 980.

The record as a whole must be considered, weighing both the evidence that supports and detracts from the Commissioner's conclusion.  *Sandgathe*, 108 F.3d at 980; *Jones,* 760 F.2d at 995.  If there is substantial evidence to support the administrative finding, or if there is conflicting evidence that will support a finding of either disability or nondisability, the finding of the Commissioner is conclusive. *Sprague v. Bowen*, 812 F.2d 1226, 1229-1230 (9th Cir. 1987).  If the evidence is susceptible to more than one rational interpretation, the court may not substitute its judgment for that of the Commissioner. *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999); *Morgan v. Commissioner*, 169 F.3d 595, 599 (9th Cir. 1999).

This Court reviews the ALJ's decision pursuant to 42 U.S.C. § 405(g) to determine whether it is: (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a whole.  *Copeland v. Bowen*, 861 F.2d 536, 538 (9th Cir. 1988).  "A decision of the ALJ will not be reversed for errors that are harmless." *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

Plaintiff bears the burden to prove that she is disabled which requires presentation of "complete and detailed objective medical reports of his condition from licensed medical professionals." *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999) (citing 20 C.F.R. §§ 404.1512(a)-(b), 404.1513(d)). Plaintiff must furnish medical and other evidence about plaintiff's medical impairments.  20 C.F.R. §§ 404.1512(a), 416.912(a); ("[Y]ou must bring to our attention everything that shows that you are blind or disabled."); 20 C.F.R. §§ 404.1514, 416.914 ("We need specific medical evidence to determine whether you are disabled or blind.  You are responsible for providing that evidence.")

Here, plaintiff claims disability since December 31, 2002 due to congestive heart failure, inability

---

[3]    "The district court properly affirms the Commissioner's decision denying benefits if it is supported by substantial evidence and based on the application of correct legal standards." *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997).

to breathe, swelling of hands and feet, right shoulder injury, high blood pressure, and obesity. (AR 80, 91, 109, 440.)

______With the above standards in mind, this Court turns to plaintiff's criticism of the ALJ's November 30, 2004 decision.

**Plaintiff's Ability To Work And Credibility**

Plaintiff challenges the ALJ's finding that plaintiff is able to perform "sedentary work with reaching overhead on the dominant right limited to occasional." The Commissioner contends that substantial evidence supports the ALJ's determination that plaintiff is able to perform alternative work despite plaintiff's impairments.

> After detailing the medical evidence and plaintiff's testimony (AR 22-25), the ALJ determined:
>
> Accordingly, the undersigned finds the claimant retains the following residual functional capacity: lift 10 pounds, walk/stand two hours, sit six hours, and occasionally perform postural activities and overhead reaching on the right. She has no visual, communicative, mental, environmental, or other manipulative limitations. The undersigned finds that her ability to reach overhead on the right only occasionally is not considered a significant limitation that erodes her ability to perform sedentary work, and her daily activities, which are at least consistent with sedentary work, establish she has good functional use of her right upper extremity. (AR 26.)

"The mere existence of an impairment is insufficient proof of disability." *Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993). "A claimant bears the burden of proving that an impairment is disabling." *Miller v. Heckler*, 770 F.2d 845, 849 (9th Cir. 1985). The applicant must show that he/she is precluded from his/her prior work and from "any other kind of substantial gainful work" due to such impairment. 42 U.S.C. § 423(d)(1)(A); *Matthews*, 10 F.3d at 680.

According to plaintiff, none of her "daily activities indicate that she has the capacity to perform" sedentary work. The Commissioner correctly notes that no physician suggested plaintiff is disabled under the Act. Dr. Larsen restricted plaintiff from right upper extremity heavy lifting, pushing or pulling and heavy work. (AR 246.) Dr. Larsen recommended retraining as soon as possible. (AR 247.) Dr. Rios found preserved motor strength of 5/5 in plaintiff's upper and lower extremities and that her grip strength is "bilaterally strong and adequate." (AR 275.) Dr. Rios noted plaintiff's limited right shoulder range of motion secondary to pain but "no true impingement syndrome." (AR 276.) Dr. Dozier restricted plaintiff to lift above her head using her right upper extremity. (AR 370.) Dr. Dozier assessed

that plaintiff is able to lift/carry 20 pounds occasionally and 10 pounds frequently. (AR 370.) Dr. Bobba found that plaintiff is able to lift/carry 20 pounds occasionally and 10 pounds frequently and limited plaintiff in reaching. (AR 393, 395.) Dr. Bobba assessed a light residual functional capacity with right upper extremity limitations. (AR 397.) Dr. Khong found that plaintiff is able to lift/carry 20 pounds occasionally and 10 pounds frequently and assessed a medium residual functional capacity with postural limits. (AR 378, 390.) Another DDS physician agreed with Dr. Khong's assessment. (AR 384.)

Moreover, the ALJ justifiably discounted plaintiff's claims as to her limitations. "Credibility determinations are the province of the ALJ." *Fair v. Bowen*, 885 F.2d 597, 604 (9th Cir. 1989); *Russell v. Bowen*, 856 F.2d 81, 83 (9th Cir. 1988). "An ALJ cannot be required to believe every allegation of disabling pain." *Fair*, 885 F.2d at 603. An ALJ "may disregard unsupported, self-serving statements." *Flaten v. Secretary of Health & Human Services*, 44 F.3d 1453, 1464 (9th Cir. 1995).

A claimant bears an initial burden to "produce objective medical evidence of underlying 'impairment,' and must show that the impairment, or a combination of impairments, 'could reasonably be expected to produce pain or other symptoms.'" *Baston v. Commissioner of Social Security Admin.*, 359 F.3d 1190, 1196 (9th Cir. 2004) (quoting *Smolen*, 80 F.3d at 1281)). If a claimant satisfies such initial burden and "if the ALJ's credibility analysis of the claimant's testimony shows no malingering, then the ALJ may reject the claimant's testimony about severity of symptoms with 'specific findings stating clear and convincing reasons for doing so.'" *Baston*, 359 F.3d at 1196 (quoting *Smolen*, 80 F.3d at 1284). "If the ALJ finds that the claimant's testimony as to the severity of her pain and impairments is unreliable, the ALJ must make a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002).

If an ALJ's credibility finding is supported by substantial evidence in the record, a reviewing court may not engage in second-guessing. *Thomas*, 278 F.3d at 959. A reviewing court will not reverse an ALJ's credibility determinations "based on contradictory or ambiguous evidence." *Johnson*, 60 F.3d at 1434 (citing *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984)). "So long as the adjudicator makes specific findings that are supported by the record, the adjudicator may discredit the claimant's allegations based on inconsistencies in the testimony or on relevant character evidence." *Bunnell v. Sullivan*, 947

F.2d 341, 346 (9th Cir. 1991).  Moreover, "the ALJ is entitled to draw inferences 'logically flowing from the evidence.'" *Macri v. Chater*, 93 F.3d 540, 544 (9th Cir. 1996) (quoting *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982)).

In *Light v. Social Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997), the Ninth Circuit commented:

> In weighing a claimant's credibility, the ALJ may consider his reputation for truthfulness, inconsistencies either in his testimony or between his testimony and his conduct, his daily activities, his work record, and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which he complains. *Smolen*, 80 F.3d at 1284; *Moncada v. Chater*, 60 F.3d 521, 524 (9th Cir. 1995) (quoting *Orteza v. Shalala*, 50 F.3d 748, 749-50 (9th Cir. 1995)); 20 C.F.R. § 404.1529(c).  An ALJ's finding that a claimant generally lacked credibility is permissible basis to reject excess pain testimony.

*See also* SSR 96-7p.[4]

An ALJ may consider the following factors to determine the credibility of a claimant's allegations of disabling pain:

    1.    The nature, location, onset, duration, frequency, radiation, and intensity of any pain;

    2.    Precipitating and aggravating factors (e.g., movement, activity, environmental conditions);

    3.    Type, dosage, effectiveness, and adverse side-effects of pain medication;

    4.    Treatment, other than medication, for pain relief;

    5.    Functional restrictions;

    6.    Claimant's daily activities;

    7.    Unexplained, or inadequately explained, failure to seek treatment or to follow up a prescribed course of treatment; and

    8.    Ordinary techniques to test a claimant's credibility.

*Bunnell*, 947 F.2d at 346; *see* 20 C.F.R. §§ 404.1529, 416.929.

---

[4] SSR 96-7p sets out factors to assess a claimant's credibility: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) type, dosage, effectiveness, and side effects of any medication claimant takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, claimant receives or has received for relief of pain or other symptoms; (6) measures other than treatment claimant uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing 15 to 20 minutes every hour, or sleeping on a board); and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms.

The ALJ thoroughly addressed plaintiff's credibility:

> I find her obesity, back pain, and right shoulder complaints are partially credible as the SA [State Agency] determinations indicated she could perform a slightly modified range of light work (Exhibits 9F-10F); the CE's [consultative evaluations] of record also establish she can perform light work (Exhibits 4F & 7F); and she performs daily activities which are at least consistent with sedentary work and establish she has good use of her right upper extremity (Exhibit 8E & testimony). Additionally, treatment of her right shoulder subsequent to December 31, 2002 is very minimal and none of her treating sources identified any functional limitations or that she was disabled due to these complaints beginning December 31, 2002 (Exhibits 5F-6F, 8F & 11F).
>
> Lumbar x-rays in May 2003 were normal (Exhibit 7F, p 7) and right shoulder x-rays in September 2002 showed no acute bony, joint or soft tissue abnormality and the AC and glenohumeral joints were unremarkable (Exhibit 4F, p 5); there is no evidence of any surgery on her spine or any shoulder since her alleged onset date; and Channel Island Orthopedic records document April 5, 2001 right shoulder x-rays showed not fracture, subluxation or acute signs of inflammation, and she was reported to [be] doing better, May 7, 2001 x-rays showed no fracture, subluxation or acute sign of infection, there was good subacromial decompression and was doing much better, June 12, 2001 she continued to improve following right shoulder surgery, and August 14, and September 26, 2001 x-rays showed no fractures, subluxation or severe degenerative changes of the shoulder (Exhibit 3F).
>
> Lastly, the undersigned further finds there is no evidence of any chiropractor treatment or physical therapy for her back pain; there is no evidence of any treatment at a pain clinic; she is not on any special diet for her obesity; she was able to perform some work in 2002 despite her right shoulder complaints (Exhibit 3D); and during her hospitalization in June 2004 she was not treated for any of these complaints (Exhibit 11F).
>
> Given the preceding factors, these complaints are found partially credible. There is no basis for concluding the claimant is disabled by her severe impairments so as to preclude even sedentary work. The claimant worked for a collection agency in Sacramento until December 31, 2002, with her work ending when she was diagnosed with CHF [congestive heart failure] and she elected not to return to work. As indicated above, the claimant's CHF has been determined to not be a severe medical impairment. Her severe impairments of back pain, obesity, and right shoulder pain did not prevent her work with the collection agency and she did not stop working because of them. (AR 25-26.)

The ALJ further noted:

> The claimant did not testify to any specific sit limitations claiming she was restless due to her neck and back discomfort. However, the claimant stated her pain level was 2 and ½ on a scale of 1 to 5 and that motrin gave relief although she claimed drowsiness or tiredness because of the medication. Yet there is no evidence in the file that the claimant complained of sleepiness or drowsiness because of the use of motrin which would not be expected to cause such side effects. The claimant's pain level is not at a severe level and should not prevent the performance of sedentary work. (AR 26.)

In addition, the ALJ appropriately pointed out that plaintiff daily drove and took her son to school. (AR 24.) *See Curry v. Sullivan*, 925 F.2d 1127, 1130 (9th Cir. 1991) (ALJ properly considered claimant's ability "to take care of her personal needs, prepare easy meals, do light housework, and shop

1   for some groceries).  Moreover, plaintiff washes dishes, changes bedding, grocery shops, drives two

2   miles to church, sings in her church choir and has no difficulty dressing and bathing.  (AR 465, 473-

3   475.)

4          The record reveals inconsistencies to further discount plaintiff's claims.  Plaintiff claimed she

5   stopped working on December 31, 2002 because of inability to drive to work on the freeway, not her

6   alleged impairments.  (AR 109.)  Plaintiff claimed she needed assistance to dress despite her testimony

7   to the contrary.  (AR 133.)  Plaintiff noted that she drove daily and around town for 30 minutes a day

8   to contradict her driving difficulty claims.  (AR 134, 274.)  Plaintiff noted she used a cane and had fallen

9   several times although there is no medical record of such.  (AR 135, 462.)  Plaintiff's claims of day-time

10  sleep induced by pain medication is inconsistent with her claim of needing sleeping pills.  (AR 138.)

11  Of further note, plaintiff denied mental health care or recent physical therapy for her shoulder despite

12  her claims to warrant such care.  (AR 463, 477.)  Plaintiff engaged in an unexplained pattern of missing

13  physical therapy appointments for her right shoulder despite physician admonishment to attend physical

14  therapy.  (AR 207, 255, 296, 314, 319, 320.)

15         The evidence fails to support plaintiff's far reaching limitation claims.  Plaintiff fails to

16  demonstrate a disabling impairment or one which reasonably could be expected to produce her alleged

17  pain and symptoms.  The ALJ made specific findings supported by clear and convincing reasons to

18  discount plaintiff's claims.  Based on the substantial evidence supporting the ALJ's credibility

19  determination, this Court is not in a position to second guess the ALJ.

20         Plaintiff argues that "the ALJ's findings that Carolyn Martin is limited to occasional overhead

21  reaching on her dominant right upper extremity is a significant nonexertional limitation which required

22  use of a vocational expert" and that the "ALJ's use of the grids to deny Carolyn Martin's claim was

23  improper."  The Commissioner responds that although plaintiff is able to reach overhead "occasionally

24  with her right arm, she had no limitations with regard to her left arm.  Moreover, she had no limitations

25  with regard to reaching forward, backward, sideways, or down with her right arm."

26                                  **Non-Exertional Impairment**

27         In the final step of the five-step disability evaluation, the Commissioner has the burden to show,

28  in light of a claimant's residual functional capacity, he/she can engage in other substantial gainful work

21

1   that exists in the national economy.  *Osenbrock v. Apfel*, 240 F.3d 1157, 1162 (9th Cir. 2001).  The

2   Commissioner may meet this burden by testimony of a vocational expert or reference to the Medical-

3   Vocational Guidelines.  *Osenbrock*, 240 F.3d at 1162.

4          If a claimant has significant non-exertional impairments, an ALJ cannot rely on the Medical-

5   Vocational Guidelines (also known as "grids").  *Osenbrock*, 240 F.3d at 1162.  "Non-exertional

6   limitations are limitations that do not directly affect a claimant's strength."  *Buckart v. Bowen*, 856 F.2d

7   1335, 1340 (9th Cir. 1988).  An ALJ correctly applies the Medical-Vocational Guidelines when a

8   claimant fails to establish a significant non-exertional impairment.  *Marci v. Chater*, 93 F.3d 540, 545

9   (1996).  If the Medical-Vocational Guidelines fail to accurately describe a claimant's limitations, an ALJ

10  may not rely on the Medical-Vocational Guidelines alone to show the availability of jobs for the

11  claimant and must hear testimony of a vocational expert.  *Reddick v. Charter*, 157 F.3d 715, 729 (9th Cir.

12  1998); *Jones*, 760 F.2d at 998.  When vocational expert testimony is used, the vocational expert must

13  identify a specific job or jobs in the national economy having requirements that the claimant's physical

14  and mental abilities and vocational qualifications would satisfy.  *Osenbrock*, 240 F.3d at 1162-1163.[5]

15         In *Desrosiers v. Secretary of Health and Human Servs.*, 846 F.2d 573, 576 (9th Cir. 1988), the

16  Ninth Circuit Court of Appeals provided ALJs guidance to address claims of non-exertional limitations:

17         [T]he fact that a non-exertional limitation is alleged does not automatically preclude
           application of the grids.  The ALJ should first determine if a claimant's non-exertional
18         limitations significantly limit the range of work permitted by his exertional limitations.
           *Razey v. Heckler*, 785 F.2d 1426, 1430 (9th Cir. 1986); *Blacknall v. Heckler*, 721 F.2d
19         1179, 1181 (9th Cir. 1983); *Olde v. Heckler*, 707 F.2d 439, 440 (9th Cir. 1983).

20              The ALJ must weigh conflicting evidence concerning the claimant's past work
           experience, education, and present psychological and physical impairments.  The ALJ
21         then applies the grids to these factors, ensuring that the final determination will be both
           consistent with other similar cases and expeditious.  The claimant may challenge the

22

----

23         [5]      The Ninth Circuit Court of Appeals has further noted:

24              When a claimant's non-exertional limitations are "sufficiently severe" so as to significantly limit
           the range of work permitted by the claimant's exertional limitations, the grids are inapplicable.  *Desrosiers*,
25         846 F.2d at 577.  In such instances, the Secretary must take testimony of a vocational expert, *Jones*, 760
           F.2d at 998, and identify specific jobs within the claimant's capabilities.  *Kail v. Heckler*, 722 F.2d 1496,
26         1498 (9th Cir. 1984).  Thus, the grids will be inappropriate where the predicate for using the grids – the
           ability to perform a full range of either medium, light or sedentary activities – is not present.

27

28  *Burkhart*, 856 F.2d at 1340.

1   sufficiency of the evidence supporting the ALJ's assessment.   A non-exertional
2   impairment, if sufficiently severe, may limit the claimant's functional capacity in ways
    not contemplated by the guidelines. In such a case, the guidelines would be inapplicable.

3          All this can be accommodated to a system of fair and expeditious disposition of
    claims by those asserting pain or other non-exertional limitations. It is not necessary to
4   permit a claimant to circumvent the guidelines simply by alleging the existence of a non-
    exertional impairment, such as pain, validated by a doctor's opinion that such
5   impairment exists. To do so frustrates the purpose of the guidelines.

6   *Desrosiers,* 846 F.2d at 577 (citing decisions from the Second, Fourth, Fifth, Sixth and Eighth Circuit

7   Courts of Appeals).

8          As noted above, plaintiff failed to establish a significant non-exertional impairment to limit the

9   range of work permitted by her exertional limitations. The ALJ accommodated plaintiff to occasional

10  overhead reaching on the right. (AR 28.) The ALJ properly discounted plaintiff's credibility and in turn,

11  reasonably determined that plaintiff is able to perform work in the national economy, including sedentary

12  work. Plaintiff establishes no error in the ALJ's use of the Medical-Vocational Guidelines.

13                              **CONCLUSION AND ORDER**

14         For the reasons discussed above, this Court finds no error in the ALJ's analysis and that the ALJ

15  properly concluded plaintiff is not disabled. This Court further finds the ALJ's decision is supported by

16  substantial evidence in the record as a whole and based on proper legal standards. Accordingly, this

17  Court DENIES plaintiff's request to reverse the Commissioner's decision to deny plaintiff disability

18  insurance benefits and SSI or to remand for further proceedings. This Court DIRECTS the Court's clerk

19  to enter judgment in favor of defendant Jo Anne B. Barnhart, Commissioner of Social Security, and

20  against plaintiff Carolyn Martin and to close this action.

21         IT IS SO ORDERED.

22  **Dated:    June 26, 2006**                    **/s/ Lawrence J. O'Neill**
23  66h44d                                    UNITED STATES MAGISTRATE JUDGE

24

25

26

27

28